UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SAMMER KAROUT,<br>    *Plaintiff,*<br><br>    *v.*<br><br>A. DENNIS MCBRIDE, DAVID B. SULKIS, SUSAN SHAW and CITY OF MILFORD,<br>    *Defendants.* | Civil No. 3:11cv1148 (JBA)<br><br><br>September 21, 2012 |

RULING ON DEFENDANTS' MOTION TO DISMISS

Plaintiff Sammer Karout filed suit against the City of Milford and Dennis McBride, the Director of the Health Department, David Sulkis, the City Planner, and Susan Shaw, the Chair of the Planning and Zoning Board, alleging in Count One by all Defendants violations of the First Amendment right to free speech and association, due process, and equal protection as guaranteed by the Fourteenth Amendment of the United States Constitution, and unlawful conspiracy in violation of 42 U.S.C. §§ 1985, 1986.[1] Plaintiff also alleges municipal liability against Defendant City of Milford (Count Two), Intentional Infliction of Emotional Distress (Count Three), and Tortious Interference with Business Relations (Count Four). Defendants move [Doc. # 19] to dismiss Count One for failure to state a claim upon which relief can be granted. For the reasons that follow, Defendants' motion will be granted in part and denied in part.

---

[1] Plaintiff's opposition [Doc. # 25] does not address Defendants' motion to dismiss his claims under 42 U.S.C. §§ 1985 and 1986; thus, these claims are deemed abandoned. *Hanig v. Yorktown Central School District*, 384 F. Supp.2d 710, 723 (S.D.N.Y. 2005).

I.      Factual Allegations

Plaintiff alleges the following in his Complaint [Doc. # 1]. Plaintiff was born in Syria, is a Muslim (Compl. ¶ 6–7), and is the owner of the Olive Tree Hookah Lounge and the Olive Tree, a Middle Eastern grocery and restaurant (*id.* ¶ 5).

On June 19, 2009, Defendant McBride issued a notice and order claiming that Plaintiff's "business constituted a public health nuisance" and that Plaintiff cease operation of his hookah lounge business (*id.* ¶ 18), which Plaintiff alleges "evidenced hostility to Middle Eastern culture and the use of the Hookah" (*id.* ¶ 19). McBride "rescinded" his orders on June 26, 2009, but renewed the public health order on June 27, 2009. (*Id.* ¶¶ 22–23.) On June 30, 2009, Defendant City of Milford ordered Plaintiff to "cease and desist his business operation" based on zoning regulations (*id.* ¶ 50), and Defendant Sulkis told Plaintiff that he needed a "Special Exception Permit" to operate the Hookah Lounge, in addition to meeting several other "requirements" (*id.* ¶ 52).

The requirements that Sulkis imposed on Plaintiff included: that Plaintiff provide an A–2 survey of the shopping center in which the Hookah Lounge is located, a "site plan" of the shopping center, including the number of businesses located in the center, the "number of parking spaces, and shrubbery and trees at the site, an outdoor lighting plan; a detailed floor plan, . . . the maximum number of guests; and a statement of "Use." (*Id.* ¶ 53.) Plaintiff alleges that these requirements were not imposed upon other business owners "not of the plaintiff's national origin, religion, ethnicity, ancestry or who have complained about such treatment by the defendants" (*id.* ¶ 54), and further that the "requirements" were "impediments placed upon [him]," in order to "prevent the opening of the Hookah Lounge,

2

or to make the administrative process so onerous that [he] would abandon the project" (*id.* ¶ 55).

Plaintiff alleges that he met all of the requirements imposed upon him by Sulkis, but that "[n]evertheless, . . . Sulkis imposed further onerous and unfair requirements upon [him]" (*id.* ¶ 59), which he again met (*id.* ¶ 59). On April 26, 2010, Plaintiff "formally complained in writing" to Defendants about the discriminatory treatment he was experiencing, including "expressly complaining" that the City was acting to prevent an ethnic establishment from opening (*id.* ¶ 62), that Defendants were acting to thwart the opening of an establishment "oriented to serve the Middle Eastern community" (*id.* ¶ 63), and that Defendants were taking the position that the Hookah Lounge would not be allowed to open, that Sulkis unfairly required that enclosures for dumpsters be created behind the Hookah Lounge's building, although "such dumpsters ha[d] been present in the same condition and location for many years prior to the plaintiff's application" (*id.* ¶ 65), that Sulkis "spoke disparagingly" about the surveyor that Plaintiff selected and that he required a lighting survey and additional landscaping (*id.* ¶¶ 68, 70). Plaintiff filed a written complaint to the City Attorney of Milford (*id.* ¶ 72), and Mr. Sultaneh Jaser, the owner of the property in which the Hookah Lounge is located, wrote to Sulkis complaining that "dozens of businesses have come and gone from [his] plaza," and until Plaintiff's wanted to open the Hookah Lounge, these requirements had never come up (*id.* ¶ 76).

Plaintiff had also appealed McBride's orders to close his business, and on April 30, 2010, the State Department of Public Health ("DPH") issued a Proposed Memorandum of Decision finding that McBride and Defendant City of Milford "lacked jurisdiction to issue orders closing the plaintiff's business" (*id.* ¶ 25), because use of the hookah "is not a

3

regulated or statutorily prohibited activity, and does not constitute a public nuisance." (*Id.* ¶ 26.) DPH upheld McBride's conclusion that "porous hookah hoses pose a communicable disease risk." (*Id.* ¶¶ 26–27.) Plaintiff alleges that all elements of McBride's order were "invalidated or remitted," but that "McBride, in further effort to delay, harm and prejudice the plaintiff, requested an opportunity to file a brief and present oral argument." (*Id.* ¶¶ 30–31.)

       A.      Department of Health Decision

On October 6, 2010, the DPH issued a Memorandum of Decision finding that "local health officials failed to present sufficient evidence that a public nuisance exists and local health officials acknowledged that they do not know what method of cleaning [pipes] would be appropriate." (*Id.* ¶ 34.) In spite of this decision, Plaintiff alleges that "McBride continued to force the plaintiff's business to remain closed." (*Id.* ¶ 35.) McBride "required that a yellow placard from the Milford Health Department remain on the door of the plaintiff's business stating that the premises are 'Unfit for Occupancy,'" (*Id.* ¶ 38.) Plaintiff also alleges that McBride has proposed legislation to the Connecticut Legislature "banning hookah lounges, which would outlaw the plaintiff's ages old, Middle Eastern cultural and social practice." (*Id.* ¶ 39.)

On December 3, 2010, McBride "created an entirely new set of onerous and baseless requirements which he imposed upon the plaintiff before he would allow the plaintiff to operate his business." (*Id.* ¶ 40.) On December 20, 2010, McBride "admitted in writing that the plaintiff was in compliance with Notice of Violation as amended by the State of Connecticut Department of Public Health" (*id.* ¶ 44), though he also stated that "the Milford Health Department continues to be concerned regarding the negative public health

implications associated with hookah smoking," and that his department would "'continue to exercise its jurisdiction'" over Plaintiff's business (*id.* ¶ 46).

Plaintiff alleges that Defendant McBride "manufactured further additional false and pretextual reasons for his conduct" and impediments to Plaintiff's business (*id.* ¶ 47), and Plaintiff confirmed with the State of Connecticut that "aspects of the law" that McBride was relying on "did not apply to Plaintiff" (*id.* ¶ 48).

B. Planning and Zoning Board Hearings and Decision

Plaintiff "attended several meetings" of the Planning and Zoning Board, and public hearings were conducted on Plaintiff's application for a Special Exception Permit. (*Id.* ¶ 80.) At the first meeting, Plaintiff presented a petition in favor of the Hookah Lounge with over seven hundred signatures. (*Id.* ¶ 83.) Plaintiff attended several subsequent sessions, in which he alleges that the Board, and specifically Defendants Shaw and Sulkis, refused to act on his application and "placed further requirements upon" him. (*Id.* ¶¶ 85–88.) At a meeting held on March 1, 2011, Plaintiff learned that a two–thirds vote was required for a Special Exception permit to be approved. (*Id.* ¶ 93.) The Board voted six in favor of Plaintiff's application for a Special Exception, and two opposed (*id.* ¶ 96). Sulkis stated that the two–third rule referred to the "entire Board, rather than the quorum present," and that accordingly, the motion failed. (*Id.* ¶ 97.)[2] Plaintiff alleges that "other Board members stated that [he] was being punished by the action of Defendants Shaw and Sulkis." (*Id.* ¶ 99.)

---

[2] "Special Exceptions," Section 7.3 of the Planning and Zoning Board Regulations, provides in pertinent part: "The Planning and Zoning Board shall hear and decide, approval shall require *a two–thirds vote of the entire Board*, requests for Special Exceptions where allowed by the terms of these Regulations." (*See* Ex. A to Defs.' Mem. Supp. (emphasis added).)

5

On March 7, 2011, Defendants informed Plaintiff that his application to open the Olive Tree Hookah Lounge was denied, that they would no longer consider his application, and that he could not reapply for a Special Exception Permit for six months. (*Id.* ¶ 102.) On April 5, 2011, the Board met in executive session to "secretly discuss" Plaintiff's application for a Special Exception Permit. Defendant Sulkis and two city attorneys were present at the meeting. (*Id.* ¶¶ 104–105.) Plaintiff also alleges that Defendants "conspired" in the executive session to "continue to deny" his Special Exception Permit. (*Id.* ¶ 106.)

Plaintiff further alleges that Defendants' conduct constitutes "an ongoing pattern of discrimination, disparate treatment, harassment, and retaliation based on [his] national origin, religion, ethnicity, ancestry and in retaliation for [his] complaints about such treatment by the defendants." (*Id.* ¶ 108.)

II.   Discussion[3]

Defendants move to dismiss Count One of the Complaint, arguing that his First Amendment, Equal Protection, and procedural due process claims all fail to state a plausible claim for relief.

---

[3] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

### A. First Amendment Claims

Plaintiff claims that Defendants violated his right to freedom of association and retaliated against him for complaining about how he was treated by McBride and the Zoning Board, both in violation of the First Amendment.

#### 1. *Freedom of Association*

Plaintiff alleges that Defendants' actions in rejecting his application for a Special Exception Permit to operate his Hookah Lounge violated his right to freedom of association. While the United States Constitution has been held to protect two distinct types of association, intimate association and expressive association, *see Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984), "[t]he Constitution does not recognize a generalized right of social association." *Sanitation and Recycling Indus., Inc., v. City of New York*, 107 F.3d 985, 996 (2d Cir. 1997).

##### a. Intimate Association

Plaintiff's Complaint generally alleges that citizens of Milford expressed their support for Plaintiff's Hookah Lounge (*id.* ¶ 84), that "Hookah smoking is a typically Middle Eastern cultural and social activity" (*id.* ¶ 19), and that Hookah lounges "form a locus for Middle Eastern culture" (*id.* ¶ 21). However, these allegations on their own do not state a claim for the violation of a right to intimate association, which the Supreme Court has reasoned applies to "close ties with others," including marriage, childbirth, family relationships, and that: "as a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty." *Roberts*, 468 U.S. at 620. There, the Supreme Court held that the Jaycees' local chapters were "neither small nor selective," and that "much of the

7

activity central to the formation and maintenance of the association involves the participation of strangers to the relationship," *id.* at 621, and concluded that accordingly, the Jaycees group lacked "the distinctive characteristics that might afford constitutional protection" under a right of intimate association. *Id.* Here, too, the group that Plaintiff alleges would use his Hookah Lounge—i.e., the citizens of Milford—are "neither small nor selective," and the Hookah Lounge's success as a business "involves the participation of strangers to the relationship." Thus, Plaintiff has failed to state a claim of a violation of the right to intimate association.

b. Expressive Association

The freedom of expressive association protects "the right of individuals to associate for purposes of engaging in activities protected by the First Amendment, such as speech, assembly, the exercise of religion, or petitioning for the redress of grievances." *Sanitation and Recycling*, 107 F. 3d at 996. "These are the so–called 'political' associational rights." *Id.* at 997. "The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000).

Here, Plaintiff alleges that hookah smoking has a historical and cultural role in Middle Eastern society, but has not alleged what form of "expression" would be engaged in by the gathering of patrons of all ethnicities and religions at a Hookah Lounge. In *City of Dallas v. Stanglin*, 490 U.S. 19 (1989), the Supreme Court noted that "patrons of the same business establishment" were not members of an organized association so as to be protected by the First Amendment. 490 U.S. at 24 ("These [social dance] opportunities might be

8

described as 'associational' in common parlance, but they simply do not involve the sort of expressive association that the First Amendment has been held to protect.") The Court held that "the activity of these dance–hall patrons—coming together to engage in recreational dancing—is not protected by the First Amendment," and thus that the activity was not a form of "expressive association" of the type described in *Roberts. Id* at 25 ("[W]e do not think the Constitution recognizes a generalized right of 'social association' that includes chance encounters in dance halls."). Here, the right of association that Plaintiff describes is a "typically Middle Eastern cultural and social activity" (Compl. ¶ 19), and that people of "Middle Eastern descent gather [at hookah lounges] to socialize, exchange ideas, and enjoy their cultural heritage" (*id.* ¶ 21). However, as the Constitution does not recognize a general right of social association, under *Stanglin*, hookah smoking and related socializing would not appear to be protected by the First Amendment's right of expressive association.

However, even if Plaintiff's right to associate with others in order to celebrate Middle Eastern culture were constitutionally protected, Defendants' actions are not alleged to have prohibited Plaintiff or others from associating together to use the hookah, only from doing so at Plaintiff's place of business. Thus, Plaintiff's Complaint does not plausibly state a claim that Defendants interfered with his right to expressive association. *See Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) ("the decision of Commissioner Bratton to withdraw official NYPD recognition from FFI and to prohibit FFI from posting its notices on police premises does not 'directly and substantially interfere' with the rights of its members to exercise their freedom of association. . . . Commissioner Bratton did not 'prevent' the members of FFI from associating together nor burden in any significant

9

manner their ability to do so."). Accordingly, Defendants' motion to dismiss Plaintiff's freedom of association claims is granted.

### 2. *First–Amendment Retaliation*

Defendants also move to dismiss Plaintiff's First Amendment retaliation claim. For a plaintiff to state a First Amendment retaliation claim, he must allege: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right. *Kuck v. Danaher*, 600 F. 3d 159, 168 (2d Cir. 2010). In *Kuck*, the Second Circuit affirmed dismissal of plaintiff's First Amendment retaliation claim because "nothing in the complaint suggests that Kuck's speech was 'actually chilled' as a result of the [defendant's] statements," and thus, concluded that "Kuck's First Amendment retaliation claim fails on the pleadings." *Id.* at 168.

Here, the Complaint contains no allegations that Plaintiff's speech was "actually chilled" as a result of the complaints he made to the Defendants on account of Defendant McBride's and the Zoning Board's actions. Plaintiff argues that "actual chill" is not a requirement of his pleading, and in support cites to a recent Second Circuit decision, *Zherka v. Amicone*, 634 F.3d 642 (2d Cir. 2011), in which the Second Circuit held that allegations of "actual chill" were not required for plaintiff's claim of per se defamation under the circumstances at issue, noting that "[w]here chilling is not alleged, other forms of tangible harm will satisfy the injury requirement . . . whenever the plaintiff has clearly alleged a *concrete* harm independent of First Amendment chill." *Id.* at 646 (emphasis in original) (internal citations omitted). However, the Second Circuit emphasized that "[d]espite these

10

limited exceptions, as a general matter, First Amendment retaliation plaintiffs must typically allege 'actual chilling.'" *Id.* at 645.

Here, even considering the limited exception described in *Zherka*, Plaintiff's Complaint fails to state a claim of First Amendment retaliation because he does not allege facts that plausibly state that "defendants' conduct was motivated by or substantially caused by plaintiff's exercise of free speech." *See Gill v. Pidlypchak*, 389 F.3d 379, 383 (2d Cir. 2004) (citing *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994)). The Complaint alleges that Plaintiff's complaints of April and July 2010 (*see* Compl. ¶¶ 61–79) were submitted to the City Attorney of Milford (*id.* ¶ 78), and that Plaintiff "attended several meetings of the Planning and Zoning Board" (*id.* ¶ 80), and that "further requirements" were placed on Plaintiff after the first meeting (*id.* ¶ 85). However, there are no factual allegations inferably connecting Defendants' rejection of Plaintiff's application for a Special Exception Permit in March 2011 with Plaintiff's complaints in 2010. Thus, Plaintiff's retaliation claim must be dismissed.

B.  Equal Protection

Plaintiff also alleges a violation under the Equal Protection clause of the Fourteenth Amendment. To prevail on a claim of selective enforcement, the Second Circuit requires that a plaintiff show both (1) that he or she was treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *Harlen Ass. v. Inc. Village of Mineola*, 273 F. 3d 494, 499 (2d Cir. 2001) (internal citations and quotation marks omitted).

11

"At the motion to dismiss stage, . . . a court . . . must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011). Thus, "[w]ell–pled facts showing that the plaintiff has been treated differently from others similarly situated remains an essential component of such a claim and conclusory allegations of selective treatment are insufficient to state an equal protection claim." *Id.* (internal citations omitted).

Though Plaintiff's Complaint fails to specifically name any businesses similarly situated to Plaintiff's that were treated more favorably by Defendants, it alleges that "dozens of businesses had come and gone from this plaza, and until the plaintiff's efforts to open the Hookah Lounge, these issues have never existed." (Compl. ¶ 76.) While the factual allegations are sparse, Mr. Jaser's references to how other businesses were treated that were located in the same plaza—compared to the more stringent requirements placed on Plaintiff's Hookah Lounge—and Ms. Shaw's comments at the March 1, 2011 meeting that "other, more acceptable businesses might open in the plaza" (*id.* ¶ 94), are sufficient to state a plausible equal protection claim, and a developed factual record will more appropriately test the merits of Plaintiff's claim of selective enforcement on summary judgment. Accordingly, Defendants' motion to dismiss Plaintiff's Equal Protection claim will be denied.

C.   Due Process

To state a claim for a violation of substantive or procedural due process, a plaintiff must initially allege a constitutionally protected interest. *See Harlen Associates*, 273 F.3d at 504 (2d Cir. 2001) (a substantive due process claim must show (1) a valid property interest and (2) that defendants infringed that property interest in an arbitrary or irrational manner);

12

*Patterson v. City of Utica*, 370 F.3d 322, 329 (2d Cir. 2004) ("The Due Process Clause of the Fourteenth Amendment requires that, generally, a person must be afforded the opportunity for a hearing prior to being deprived of a *constitutionally protected liberty or property interest.*") (emphasis added). Defendants contend that because Plaintiff cannot establish the existence of a constitutionally protected right, his due process claims must be dismissed.

The Second Circuit uses a strict "entitlement test" to determine whether a party's interest in land–use regulation gives rise to a protected property interest. *Gagliardi*, 18 F.3d at 192. As a general rule, "entitlement turns on whether the issuing authority lacks discretion to deny the permit, i.e., is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met." *Harlen Associates*, 273 F.3d at 504 (2d Cir. 2001). "[I]f state law makes the pertinent official action discretionary, one's interest in a favorable decision does not rise to the level of a property right entitled to procedural due process protection." *Gagliardi*, 18 F.3d at 193 *(*citing *RR Village Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1201–1202 (2d Cir. 1987)).

In *Municipal Funding, LLC v. Zoning Bd. of Appeals of City of Waterbury*, the Connecticut Supreme Court construed section 8-2 of the Connecticut General Statutes, which relates to the special exception process, as "discretionary," and stated that "the zoning board may base its denial of such an application on general considerations such as public health, safety and welfare, which are enumerated in zoning regulations."[4]  270 Conn. 447,

---

[4] Section 8-2(a) authorizes municipal zoning commissions to enact regulations providing that certain . . . uses of land are permitted only after obtaining a special permit or special exception from a zoning commission . . . . That subsection further provides that the obtaining [of] a special permit or special exception . . . is subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, convenience and property values. Thus, in accordance with § 8-2(a), an applicant's obtaining of a special

516 (Conn. 2004) (citing *A. Aiudi & Sons, LLC v. Planning & Zoning Commission*, 267 Conn. 192, 205–206 (Conn. 2004)).

Thus, because Plaintiff cannot establish that he had a constitutionally protected right to a Special Exception Permit, his claim of a substantive or procedural due process violation fails as a matter of law and Defendants' motion to dismiss the due process claims in Count One is granted.

III.    Conclusion

For the reasons discussed above, Defendants' Motion [Doc. # 19] to Dismiss Count One is GRANTED in part in DENIED in part.


IT IS SO ORDERED.


     /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 21st day of September, 2012.

---

exception pursuant to a zoning regulation is subject to a zoning commission's consideration of these general factors.