UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SAMMER KAROUT,<br>    *Plaintiff,*<br>        *v.*<br>A. DENNIS MCBRIDE, *et al.*,<br>    *Defendants.* | Civil No. 3:11cv1148 (JBA)<br><br>March 21, 2014 |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Sammer Karout filed suit against the City of Milford (the "City") and A. Dennis McBride, the Director of the Milford Health Department (the "Health Department"), David Sulkis, the City Planner, and Susan Shaw, the Chair of the Planning and Zoning Board, alleging in Count One violations of equal protection as guaranteed by the Fourteenth Amendment of the United States Constitution by all Defendants. Plaintiff also alleges municipal liability against the City (Count Two), Intentional Infliction of Emotional Distress (Count Three), and Tortious Interference with Business Relations (Count Four). Defendants move [Doc. # 52] for summary judgment. For the reasons that follow, Defendants' motion is granted.[1]

## I.    Factual Allegations

Plaintiff, a Syrian-born Muslim with dual American and Syrian citizenship, is the owner of two businesses in Milford, Connecticut. (Karout Dep. Tr., Exs. 1–2 to Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 64-3] at 7, 36–37.) Since 2008, Plaintiff has owned and operated

---

[1] The Court previously dismissed [Doc. # 29] Plaintiff's claims in Count One asserting violations of the First Amendment right to free speech and association, due process, and unlawful conspiracy in violation of 42 U.S.C. §§ 1985, 1986.

the Triple Olive Tree, a Middle Eastern grocery store and restaurant.  (*Id.* at 14.)  Around the time that Plaintiff purchased the Triple Olive Tree, he explored the possibility of opening what would become the Olive Tree Hookah Lounge in an adjacent storefront.[2]

In order to determine the legal steps required to open such an establishment, Plaintiff visited the Health Department, but was told that it did not have any jurisdiction over hookah lounges.  (*Id.* at 14.)  Plaintiff next visited the Zoning Department, where employee Linda Stock professed to have never heard of a hookah.  Plaintiff contends that Ms. Stock "kept ignoring [him] and making fun of" him and laughed at him.[3]  (*Id.* at 16.)  After consulting with another employee in the Zoning Department who could not provide any information, Plaintiff concluded that he "did not need any other permission or okay from any other department" to operate a hookah-smoking establishment.  (*Id.* at 15.)

Shortly after Plaintiff opened the Hookah Lounge in June 2009, the Mayor of Milford received a citizen complaint, contending that it was "a black mark in Milford" and that the establishment "may end up being just a haven for drugs."  (Citizen

---

[2] A "hookah" refers to a water pipe that is typically "composed of a head (with holes in the bottom to allow smoke to pass into the body's central conduit), a metal body, a water bowl, and a flexible hose with a mouth piece."  (Centers for Disease Control, *Hookahs*, Ex. M to Defs.' Loc. R. 56(a)1 Stmt. [Doc. # 53] at 34.)  Moist hookah tobacco, which is available in a variety of flavors, is placed in the head under a burning charcoal.  A user inhales through the hose and smoke passes through the water into the mouthpiece.  Hookah smoking has been widespread for approximately 400 years and is most typically practiced as a social activity "in special cafes."  (*Id.*)  "Over recent years, there has been a resurgence of use around the world, most notably among youth."  (*Id.*)

[3] After the Zoning Department employees professed to not know what a hookah was, Plaintiff explained to them that it was a "water pipe."  (Karout Dep. Tr. at 17.)

Complaint, Ex. LL to Defs.' 56(a)1 Stmt. at 2.)  The email was forwarded to multiple city agencies for investigation, including the Health Department.  (*Id.*)

### A.    Health Department Allegations

On June 19, 2009, the Health Department issued a Notice of Violation ("NOV"), declaring the Hookah Lounge a public nuisance and ordering it closed.[4]  (L. Miller Notes, Ex. I to Defs.' 56(a)1 Stmt. at 2.)  The NOV faulted the establishment as lacking any signs warning the public regarding "the contents of the hookah tobacco" or "the hazards of smoking/secondhand smoke or the hazards of the combustion of other substances that might be added to the hookah tobacco" and "inadequate means for sanitizing the smoking apparatus and the smoking hoses."   (NOV, Ex. ZZ to Defs.' 56(a)1 Stmt. at 1.) On June 26, 2009, the Health Department rescinded the original NOV, but later that same evening two inspectors returned and issued a new NOV based on inadequate sanitizing of the smoking equipment.  (*Id.*)  Some customers in the establishment were scared by the inspection and left.  (Karout Dep. Tr. at 40.)

Plaintiff appealed the NOV, and on September 24, 2009, the Connecticut Department of Public Health ("CDPH") held a hearing.  Dr. McBride testified that the Hookah Lounge was a public health nuisance due to the risk of communicable diseases that could be transmitted from the hookah pipes and that he believed it was "one of the most important public health issues that I've had to deal with in my career." (Transcript of CDPH Hearing, Ex. O to Defs.' 56(a)1 Stmt. at 71, 106.)  Dr. McBride also submitted a

_____

[4] Conn. Gen. Stat. § 19a-206(a) authorizes local health directors to "examine all nuisances and sources of filth injurious to the public health, cause such nuisances to be abated or remediated and cause to be removed all filth which in their judgment may endanger the health of the inhabitants."

report that he authored titled *Hookah Smoking: A Public Health Nuisance* (Ex. M to Defs.' Loc. R 56(a)2 Stmt.), describing the Hookah Lounge and discussing the health dangers of smoking hookah generally.

Citing and appending reports from the World Health Organization ("WHO") and the Centers for Disease Control and Prevention ("CDC"), Dr. McBride described a widely held but apocryphal public belief that hookah smoking was less dangerous than cigarettes when in fact the smoke produced by a hookah pipe "contains high levels of toxic compounds, including carbon monoxide, heavy metals, nicotine, 'tar' and cancer-causing chemicals even after it has been passed though water." (*Id.* at 4–5.)   According to the WHO, a typical hookah user would inhale 100 to 200 times the volume of smoke inhaled with a single cigarette. (*Id.* at 5.)  Because hookah tobacco is often mixed with sweeteners and artificial fruit flavors, many users mistakenly believe that it is not as addictive or harmful as cigarettes. (*Id.* at 6.)

Citing a CDC report, Dr. McBride described how "smoking a shared hookah may increase the risk of transmission of illnesses such as tuberculosis, viruses such as herpes or hepatitis," and pneumonia. (*Id.*)  Even where disposable mouthpieces were used "the tubing of the water pipe itself has the potential for spreading infectious diseases" and "diseases can be transferred in part due to the moist smoke." (*Id.*)

At the conclusion of his report, Dr. McBride discussed a report from a university health center, which described a "foreign born" student who acquired a drug-resistant strain of tuberculosis. (*Id.* at 7.)  Dr. McBride then noted:

> Nationally, foreign born individuals are 10 times more likely to get tuberculosis. (CDC, 2007). *Hookah smoking* is *of special concern to Milford.*  The concerns about the role hookahs play as source for the

4

spread of tuberculosis is a real concern for Milford.  Milford has a number
of foreign born residents.   Milford has a relatively low incidence of
tuberculosis but it does have cases.   In 2005, a Milford foreign born
resident had a serious case of kidney tuberculosis.   It also should be noted
that Milford is a major shopping and dining location for Bridgeport and
New Haven, which both have large numbers of foreign born residents and
among the highest numbers of tuberculosis in the state (CT Department of
Public Health, 2009).   In Connecticut, the majority of tuberculosis cases
are among foreign born residents.   Furthermore, a high percentage of
these residents come from continents where hookah smoking is prevalent,
including Asia and Africa (Hadler, 2005).

(*Id.*)

On October 6, 2010, the CDPH issued a Memorandum of Decision, holding that
while Mr. Karout had failed to present sufficient evidence to refute the claim that hookah
smoke "constitutes a nuisance or source of filth" under Conn. Gen. Stat. § 19a-206(a), the
Health Department had failed to establish that the smoke was a "public nuisance,"
because there was "no evidence that the smoke leaves the property in any manner, or
harms any members of the public other than those choosing to enter the lounge" with the
"sole purpose" to "knowingly smoke the hookah pipe."  (CDPH Decision, Ex. L to Defs.'
56(a)1 Stmt. at 7–8.)  The decision also concluded that the Health Department had failed
to establish that the method Mr. Karout used to clean the pipes was insufficient to
mitigate the risk of communicable diseases.  (*Id.* at 9.)

### B.      Zoning Department Allegations

On June 30, 2009, a Zoning Enforcement Officer issued a cease and desist order to
Mr. Karout, and the property owner, Sultaneh Jaser, after the recent "discovery of the
hookah lounge" by the Health Department.  (Staff Report, Ex. T to Defs.' 56(a)1 Stmt. at
1.)  The Zoning Department asserted that the Hookah Lounge did not fall within one of

the enumerated "permitted uses" for its location and could not be classified as either a store "for sale of goods or the performance of personal services," "[f]ood or beverage service establishment," or "[e]ating places." (*Id.*; *see also* Milford Zoning Regulations, Ex. R to Defs.' 56(a)1 Stmt. §§ 3.18.1.2–.3, 3.18.1.17.)   As a result, the Zoning Department required Mr. Karout to apply for a Special Exception Permit.

The Special Exception application required the submission of a site plan for approval of "the location and design of all required buffer strips, landscaping and screening," external lighting, trash containers, and parking facilities.   (Milford Zoning Regulations §§ 7.1.2.16–.17.)   It also required the Zoning Board to "take into consideration the public health, safety and general welfare" in reviewing the application. (*Id.* § 7.1.3.)   On April 30, 2010, the City Planner, Defendant David Sulkis, informed Plaintiff that his initial application was incomplete.   (Ltr. from D. Sulkis to A. Scheirer dated Apr. 30, 2010, Ex. U to Defs.' 56(a)1 Stmt. at 1.)   Mr. Sulkis also told Mr. Karout that he needed to enter into a lease with the Connecticut Department of Transportation to acquire additional parking spaces for his customers and that he needed to enclose dumpsters that already existed in the rear of the property.   (Karout Dep. Tr. at 58–60.)

The Zoning Board held meetings regarding Plaintiff's application on December 21, 2010, January 18, 2011, February 15, 2011, and March 1, 2011.   (Verbatim Minutes, Exs. A, Y, Z, AA to Defs.' 56(a)1 Stmt.)   At the first meeting, Plaintiff's attorney described the Hookah Lounge as "a cultural and social meeting place for people" from the Middle East and parts of India and Pakistan.   (Verbatim Minutes, Ex. A at 3.)   At the start of 2011, Defendant Susan Shaw became the Chair of the Planning and Zoning Board.   (*See* Shaw Aff., Ex. BB to Defs.' 56(a)1 Stmt. ¶ 3.)   At subsequent meetings, the Board

discussed whether Plaintiff's application complied with the requirements for the Special Exception permit.  At the March 1, 2011 hearing, Mr. Sulkis told the Board that the Hookah Lounge had ninety fewer parking spaces than were required and the Board would also have to grant a parking waiver.  (Verbatim Minutes, Ex. AA at 2.)

Under the Zoning Regulations requests for Special Exception Permits "approval shall require a two-thirds vote of the entire Board."  (Milford Zoning Regulations § 7.3.) At the March 1, 2011 hearing, two board members, including Defendant Shaw, voted against Plaintiff's application, and two were absent, and thus the application failed, because it did not obtain the approval of seven out of the ten board members.  In voting against the application, Ms. Shaw noted that the Board was entitled under its regulations to consider whether the proposed business would "promote the health, safety, welfare, morals, or [] comfort, convenience, appearance, prosperity of general welfare." (Verbatim Minutes at 9.)   Ms. Shaw stated that she was "not convinced" that the application should be approved "given the parking, and the other uses that are currently in [the shopping plaza] or that may be at some future date want to be there by what is already allowed." (*Id.*)

Plaintiff claims that Defendant Sulkis had informed him that his application required approval from two-thirds of the present and voting board members rather than two-thirds of all ten of the board members.  (Karout Dep. Tr. at 60–61, 72–73.)  He asserts that the two absent board members told him that they would have voted in favor of his application and had he known of this requirement, he would have waited until all ten board members were present.  (*Id.*)  Plaintiff alleges that Ms. Shaw waited to conduct the vote until some members were absent, because she wanted it to fail on account of his

7

religion and national origin.  (*Id.* at 78.)  Ms. Shaw asserts that she voted against the motion primarily because of the substantial parking waiver that would have been required.  (Shaw Aff. ¶ 6.)

Plaintiff alleges that Defendants' onerous requirements were motivated by discriminatory animus.  He contends that the businesses occupying the storefront before the Hookah Lounge—a dance studio and a grocery store that sold cigarettes—were not required to obtain the Special Exception permit or subject to the same parking requirements.  (Jaser Dep. Tr. [Doc. # ] at 9–12.)  Jaser contends that numerous other businesses at properties she owns, including restaurants, that were not operated by Muslims or Middle Easterners were not subject to the same requirements.  (*Id.* at 22–23.)

On November 20, 2012, a newly constituted Zoning Board on which no Defendants sat unanimously approved Mr. Karout's revised application after he received a lease from the State of Connecticut for additional parking spaces and submitted the required materials in support of the Special Exception permit.  (Zoning Board Minutes, Ex. HH to Defs.' 56(a)1 Stmt. at 297.)

## II.      Discussion[5]

### A.      Claim Preclusion

Defendants contend that Plaintiff's claims "related to the Health Code" are barred by claim preclusion, "because he had an opportunity to contest Dr. McBride's orders through the administrative process and did so," and did not appeal this decision.  (Defs.' Mem. Supp. [Doc. # 52-1] at 18, 20.)  Defendants assert that Plaintiff's "claim of selective enforcement is an affirmative defense" that should have been pled at the State Department of Public Health proceeding and a zoning appeal, if one had occurred.  (*Id.* at 19–20.)

Claim preclusion "prevents a litigant from reasserting a claim that has already been decided on the merits."  *CFM of Connecticut, Inc. v. Chowdhury*, 239 Conn. 375, 397 n.21 (1996).  It "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding."  *Brown v. Felsen*, 442 U.S. 127, 131 (1979).  "Under the

---

[5] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record.  Fed. R. Civ. P. 56(c).

Constitution's Full Faith and Credit Clause, federal courts must accord state court judgments the same preclusive effect as other courts within that state." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (internal citations omitted). Connecticut has adopted the "transactional approach to res judicata," *Norse Sys., Inc. v. Tingley Sys., Inc.*, 49 Conn. App. 582, 597 (1998), "barring a later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief," *Burgos*, 14 F.3d at 790. "This bar will not apply, however, where the initial forum did not have the power to award the full measure of relief sought in the later litigation." *Id.*

The CDPH appeal had the authority to address only "the merits" of the Health Department NOV and could only "vacate, modify or affirm such order." Conn. Gen. Stat. § 19a-229. Even if, as Defendants contend, a claim of selective enforcement was a defense that could have been pled in the appeal, the appellate tribunal did not have the authority to redress Plaintiff's injuries beyond vacating the NOV. Plaintiff now seeks compensatory and punitive damages as well as equitable and injunctive relief (*see* Compl. at 21), remedies that the CDPH was powerless to award. *See Leather v. Eyck*, 180 F.3d 420, 424–25 (2d Cir. 1999) ("It might seem plausible to argue that the plaintiff could have raised the essence of his current claim, selective prosecution, in his . . . criminal proceeding, and, not having done so, is barred by claim preclusion from making the allegation now. But . . . . because the nature of the prior state court proceeding was such that [the plaintiff] could not have sought damages for his alleged constitutional injuries . . . . res judicata does not bar his federal § 1983 suit for damages.").

Additionally, the CDPH hearing occurred in September 2009, before much of the factual basis for Plaintiff's constitutional claim had transpired.  Defendants' assertion that Plaintiff should have appealed the initial Zoning Board ruling is unconvincing given that Plaintiff had the opportunity to resubmit his Special Exception application six months later, which he did to a successful result.  *See LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 591 (2d Cir. 1994) ("*LaTrieste Rest. I*") ("[T]he alleged discriminatory enforcement of various laws, including the town's zoning classification, do not arise from the same set of facts, and do not even involve the same actors, as the zoning board's rejection of LaTrieste's petition to alter the terms of its variance.  The [§ 1983] suit depends on allegations . . . selective discriminatory treatment that were not involved in the Article 78 allegations, and that were committed by persons who were not parties to the Article 78 proceeding. LaTrieste could not have raised these claims in its Article 78 proceeding without adding additional parties and transforming the focus of its factual allegations.").  Therefore, Plaintiff's claims are not barred for not having been raised before the CDPH.

**B.      Equal Protection (Count One)**

Plaintiff advances an equal protection claim based on a theory of selective prosecution or enforcement.  *See LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980). To prevail on such a claim, a plaintiff must "show both (1) that he or she was treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to

injure a person." *Harlen Ass. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)

(internal citations and quotation marks omitted).

### 1.   Discriminatory Animus

Plaintiff must be able to establish that the disparate treatment he claims he experienced was motivated by discriminatory animus. "[T]he issue of intent underlying an equal protection claim generally belongs to the trier of fact." *A.B.C. Home Furnishings v. Town of E. Hampton,* 964 F. Supp. 697, 703 (E.D.N.Y. 1997) (citing *United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1216–17 (2d Cir. 1987)). However, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 452 (2d Cir. 1999).

Plaintiff asserts that an inference of discrimination arises from the fact that "despite acknowledging that the plaintiff's proposed business is neither banned nor regulated, the defendants did everything within their power to prevent the operation of that business, because of its foreign nature and origin." (Pl.'s Opp'n at 20.) Defendants contend that the fact that Plaintiff's restaurant next door to the Hookah Lounge—which was an "ethnic establishment that serves Syrian food"—was not singled out demonstrates that Defendants' actions regarding the Hookah Lounge were not motivated by discriminatory animus against Plaintiff. (Defs.' Mem. Supp. at 28).

At oral argument, Plaintiff outlined the evidence in the record from which he contended a jury could reasonably find discrimination on the basis of religion or national origin: (1) Defendants' knowledge of Plaintiff's religion and national origin; (2) the cultural ignorance and disrespect that was exhibited in response to his inquiries regarding

12

the hookah bar, particularly as manifested when Plaintiff visited the Zoning Department to inquire about opening the Hookah Lounge; and (3) Dr. McBride's pejorative conclusion about foreigners.

Defendants responded that Dr. McBride's report evidences no discriminatory animus against Plaintiff personally on the basis of his national origin or religion, but rather only reflects Dr. McBride's concern with the potential health consequences from Plaintiff's business. (Defs.' Mem. Supp. at 27.) Defendants dispute any inference of national-origin animus, because Plaintiff's Middle Eastern restaurant adjacent to the hookah lounge, which served Syrian food, was not subject to any heightened scrutiny.

While Defendants posit alternative inferences that a jury could draw from the evidence, Defendant McBride's views on the "special concern" posed by foreign-born people smoking in Milford and his conclusion that neighboring cities' "foreign born residents" could be drawn to Milford by the availability of hookah smoking, could provide minimally sufficient evidence to support an inference that his vehement opposition to the Hookah Lounge derived from a national-origin bias.

In addition, record evidence shows that Sulkis and McBride were kept informed about the coordination of efforts between the Zoning Department, with its cultural insensitivity, and the Health Department, which had failed before the CDPH, in opposing Plaintiff's business. The initial citizen complaint of June 2009 to the Mayor of Milford was forwarded in the same email to both Sulkis and McBride. (*See* Citizen Complaint at 1.) Likewise, the Zoning Department Staff Report of December 21, 2010 refers to the Health Department enforcement actions. (Staff Report at 1.)

Drawing inferences from the record in favor of Plaintiff, as is required on summary judgment, the Court will assume for its analysis that Plaintiff has presented sufficient evidence from which a jury could reasonably infer that Defendants' enforcement actions against the Hookah Lounge were animated by discriminatory animus.

### 2.   Differential Treatment of Similarly Situated Comparators

To prevail on his equal protection claim, Plaintiff must also demonstrate that he was treated differently than other similarly situated comparators by identifying "comparators whom a 'prudent person would think . . . [were] roughly equivalent.'" *Abel v. Morabito,* No. 04-CV-07284 (PGG), 2009 WL 321007, at *5 (S.D.N.Y. Feb. 11, 2009) (quoting *Estate of Morris v. Dapolito,* 297 F. Supp. 2d 680, 686 (S.D.N.Y. 2004) (alterations in original)).  "District courts in this circuit have noted that similarly situated does not mean identical, but rather a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, to the extent that an objectively identifiable basis for comparability exists" such that an inference of an impermissible reason for the disparate treatment could be fairly drawn.  *Savino v. Town of Southeast*, No. 11cv483 (NSR), 2013 WL 5730043, at *10 (S.D.N.Y. Oct. 21, 2013) (internal quotation marks and alterations omitted) (citing cases).  "As a general rule, whether [properties] are similarly situated is a factual issue that should be submitted to the jury." *Harlen Associates*, 273 F.3d at 499.  "This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Id.*

Plaintiff asserts that the Hookah Lounge is similarly situated to two classes of businesses: (1) businesses that have similar characteristics, such as "smoke shops, bars and private clubs," (Pl.'s Opp'n [Doc. # 64-1] at 29 (citing Karout Dep. Tr. at 84–5)), and (2) businesses that previously occupied the same storefront as the Hookah Lounge and other current and former occupants of the shopping plaza in which the Hookah Lounge is located.[6] (*Id.* (citing Karout Dep. Tr. at 56–8).)

The two prior occupants of the retail space now occupied by the Hookah Lounge were a ballet studio and a grocery store that sold cigarettes. (Karout Dep. Tr at 56–7.) Other occupants of the shopping plaza include a laundromat, a smoke shop, a pizzeria, a Chinese restaurant, and a bar. According to Plaintiff, none of these geographically similarly situated businesses were required to create an A-2 survey and site plan, analyzing the effect on parking, landscaping and other businesses; to generate an outdoor lighting plan; to provide a detailed floor plan, showing all seating and tables and the maximum number of guests; and to produce a "statement of use." (Pl.'s Opp'n at 30.)

Defendants argue that there are no other similarly situated comparable businesses, because it "is undisputed that the Hookah Lounge was the first one in Milford." (Defs.' Mem. Supp. at 25.) Defendants' contention that Plaintiff must identify other hookah lounges as the basis for comparison would make little sense in this case given the nature of his claim that he was subject to discrimination precisely because he was trying to

---

[6] Plaintiff's evidence regarding comparators focuses only on the application of zoning regulations to these businesses, not Health Department regulation of other businesses. (*See* Pl.'s Opp'n at 25–31.)

introduce a distinctly ethnic business to Milford for the first time and City officials seemed determined to keep such establishments from opening.

Although the Court disagrees with Defendants' narrow analysis, it nevertheless concludes that Plaintiff has not presented sufficient evidence of similarly situated comparators.   While to the casual observer, the Hookah Lounge could be roughly comparable to a restaurant, bar, smoke shop, and a private club, such properties do not make adequate comparators for an equal protection challenge because they are governed by different provisions of the Zoning Regulations.  *See Merry Charters, LLC v. Town of Stonington*, 342 F. Supp. 2d 69, 76-77 (D. Conn. 2004) ("Because the *Argia* neither applied for nor needed a special use permit . . . , the *Argia* cannot be considered similarly situated to Plaintiffs for purposes of their equal protection claim."); *see also Missere v. Gross*, 826 F. Supp. 2d 542, 562 (S.D.N.Y. 2011) ("It is unsurprising, therefore, that Missere faced greater hurdles in operating a restaurant at 9 River Ave., where there was a controversy surrounding whether a restaurant was a use authorized by the zoning code, than did Yannone at 2 Idlewild Ave., where a restaurant was concededly allowed.").

The Milford Zoning Regulations provide enumerated categories of "permitted uses"—property uses that are allowed without special approval if the applicant complies with all of the other generally applicable regulations.  (*See* Milford Zoning Regulations § 3.18.1 ("[T]he Board *shall* permit the following buildings or uses . . . ." including "Food or beverage service establishments" (*id.* § 3.18.1.3), "Eating places" (*id.* § 3.18.1.17), "Stores for sale of goods or for performance of personal services" (*id.* § 3.18.1.2), and "Self-service laundry" (*id.* § 3.18.18)).   The restaurants and laundromat identified by Plaintiff fall into this "permitted uses" zoning category, but the Hookah Lounge does not

16

because its operation is not explicitly captured as a permitted use by the zoning regulations.  Thus, the proffered "permitted use" businesses are not comparable for equal protection purposes.

Section 3.18.2 provides that other categories of property uses "may" be allowed, including "Clubs, lodges or fraternal organizations" (*id.* § 3.18.21), but the Hookah Lounge would not fit within this category either.  The definition of a club excludes entities that provide a service "[c]arried on primarily for business or gain" and includes only establishments "operated solely for a recreational, social, fraternal, religious, political or athletic purpose whose activities are confined to . . . members and guests" and not "to the general public."  (*Id.* [Doc. # 66-1] art. XI.)  The Hookah Lounge also does not fit within the definition of a "Tavern," which is an "establishment where the retail sale of beer . . . and/or wine to be consumed on the premises occurs" (*id.*) and smoking is not permitted, *see* Conn. Gen. Stat. § 19a-342.

Whether the "smoking shop" in the same plaza as the Hookah Lounge could be a comparator cannot be determined because Plaintiff presents no evidence regarding the nature of the business beyond describing it as a "smoking shop and [it] had the tables and you could smoke inside."  (Karout Dep. Tr. at 71.)  It is thus not clear whether it fell within one of the enumerated permitted uses of § 3.18.1, such as a store "for sale of goods" under § 3.18.1.2, or if, like the Hookah Lounge, it was classified as requiring a Special Exception under § 3.18.2.13.  Additionally, while Plaintiff contended that "you could smoke inside" the shop, it is not clear whether smoking was permitted by the zoning regulations at this location or if the smoking that occurred in the shop was permitted by the owner but in violation of such regulations.

17

Plaintiff's attempts to demonstrate that he was treated differently from the smoking shop— which is "the *sine qua non* of a *LeClair* selective enforcement" claim, *Doe v. Village of Mamaroneck,* 462 F. Supp. 2d 520, 555 (S.D.N.Y. 2006)—is limited to his testimony that the owner of the shop applied for unspecified permits and told Plaintiff that the process was "easy." (Karout Dep. Tr. at 71.)  No affidavit of the shop owner is offered, and Plaintiff's testimony regarding what he was told is inadmissible hearsay that cannot be used to oppose summary judgment.  Under Fed. R. Civ. P. 56(c)(1)(b), the Court can consider only material that is "presented in a form that would be admissible in evidence" at trial.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that. . . the district court in awarding summary judgment, may rely only on admissible evidence." (internal quotation marks omitted)).  Even if this testimony were admissible, this cryptic subjective description of the smoking shop owner's experience with Defendants' regulatory process provides little basis for comparison between the smoking shop and the Hookah Lounge.

Additionally, there is no record evidence regarding when the owner of the smoking shop obtained her "permits," whether the same zoning regulations were in effect at that time, or if individual Defendants were personally involved in that decision. Without such evidence, there is no basis to determine whether the owner of the smoking shop received differential treatment.  *See Cordi-Allen v. Conlon*, 494 F.3d 245, 253 (1st Cir. 2007) ("In the land-use context, timing is critical and, thus, can supply an important basis for differential treatment.  Since zoning bylaws, environmental standards, and licensing criteria may change over time, courts must be sensitive to the possibility that

differential treatment—especially differential treatment following a time lag—may indicate a change in policy rather than an intent to discriminate.").

Absent a showing of the existence of similarly situated comparators, Defendants' motion for summary judgment on Count One, claiming an Equal Protection violation against Defendants Sulkis, Shaw, and McBride, is granted.[7]

## C.    *Monell* Claim (Count Two)

Given the dismissal of Plaintiff's constitutional claims, Plaintiff's *Monell* claim in Count Two must also be dismissed because "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly

---

[7] Defendants alternatively argue that that they are entitled to qualified immunity because "reasonable officials and medical professionals such as Dr. McBride could disagree as to the contours of whether a hookah business that had no proper sanitizing facilities and only [] one bay sink, allowed patrons to smoke from the same pipe burning carcinogenic charcoal and undisclosed materials and tobacco, sharing hoses and tips was within the realm of reasonableness." (Defs.' Mem. Supp. at 31–32.)  Likewise Defendants Sulkis and Shaw contend that they are entitled to qualified immunity, because "it was objectively reasonable to deny [Plaintiff's] application." (*Id.* at 33.)  The proper inquiry, however, is not whether Defendants' actions were "objectively reasonable generally," but rather whether these actions "were objectively reasonable in light of the legal rules that were clearly established at the time they were taken." *Savino*, 2013 WL 5730043, at *13 (internal quotation marks and alterations omitted).  "[I]t is unreasonable to believe that applying or enforcing a law based on someone's national origin does not violate the Fourteenth Amendment, and no official of reasonable competence would disagree." *Id.* at *14.  Given the Court's conclusion that Defendants did not violate Plaintiff's constitutional rights, the claim of qualified immunity is moot. *See Pearson v. Callahan,* 555 U.S. 223, 231 (2009).

found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

> **D.      State Law Claims (Counts Three and Four)**

Having dismissed all of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state claims for intentional infliction of emotional distress and tortious interference with business relationships.  *See* 28 U.S.C. § 1367(c)(3); *Carnegie Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").  There is no showing of special circumstances here that would justify deviation from this general rule.  *Cf. Garden Catering-Hamilton Ave., LLC v. Wally's Chicken Coop, LLC*, No. 3:11CV1892 (JBA), 2014 WL 810821, at *12 (D. Conn. Feb. 28, 2014) (exercising discretionary supplemental jurisdiction where "both parties are smaller businesses with an ongoing dispute, and they are in particular need of a prompt adjudication").

### III.   Conclusion

For the reasons set forth above, Defendants' Motion [Doc. # 52] for Summary Judgment is GRANTED as to Counts One and Two.   The Court declines to exercise supplemental jurisdiction over Counts Three and Four.   The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 21st day of March, 2014.